IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| L-3 COMMUNICATIONS SECURITY AND DETECTION SYSTEMS CORPORATION DELAWARE,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN SCIENCE & ENGINEERING, INC.,<br><br>Defendant. | CIVIL ACTION NO. 04-10339-RWZ |

**DECLARATION OF MARK SYRNICK IN SUPPORT
OF PLAINTIFF'S OPPOSITION TO DEFENDANT
AS&E'S MOTION TO DISMISS FOR LACK OF
<u>ACTUAL CONTROVERSY</u>**

1.  I am the Vice President and General Counsel of plaintiff, L-3 Communications Security and Detection Systems Corporation Delaware ("L-3"), and submit this declaration under penalty of perjury in support of L-3's opposition to the motion of defendant, American Science & Engineering, Inc. ("AS&E"), to dismiss L-3's complaint for lack of subject matter jurisdiction.

2.  L-3 is a wholly-owned subsidiary of L-3 Communications Corporation. The relevant corporate history of L-3 is as follows.

3. In October of 1996, EG&G, Inc. and its wholly owned subsidiary, EG&G Astrophysics Research Corporation (a California corporation), were renamed PerkinElmer, Inc. and PerkinElmer Detection Systems, Inc., respectively.

4. In June of 2000, PerkinElmer, Inc., acquired Vivid Technologies, Inc. (a Delaware corporation), and gave it the same name as its other subsidiary, i.e., PerkinElmer Detection Systems, Inc.

5. In June of 2002, L-3 Communications Corporation acquired from PerkinElmer, Inc., all of the capital stock of PerkinElmer Detection Systems Inc. (California) and PerkinElmer Detection Systems, Inc. (Delaware). The acquired companies were renamed L-3 Communications Security and Detection Systems Corporation California, and L-3 Communications Security and Detection Systems Corporation Delaware, respectively.

6. I personally participated in numerous conversations with AS&E's current General Counsel, Cynthia Caruso, Acting General Counsel William F. Grieco, and AS&E's former General Counsel, Edwin L. Lewis, concerning issues relating to both past and present litigation between AS&E and L-3. I was also the sender or recipient of correspondence to and from those individuals with respect to those same matters. I am also familiar with additional relevant correspondence to and from L-3 relating to those same matters that I have reviewed on multiple occasions.

7. Based on the written materials and conversations of which I am aware, and the direct threats and other communications I have had from AS&E, I have formed a clear belief and impression that AS&E would eventually bring suit on each of the patents in its so-called "MobileSearch" patent family.

8. The patents included in AS&E's MobileSearch patent family are attached to this declaration as follows: U.S. Patent Nos. 5,903,623 (Ex. A); 6,292,533 (Ex. B); 6,252,929 (Ex. C); and 5,764,683 and its Reexamination Certificate (Ex. D).

9. I have based this belief on several factors. First of all, throughout most of the last decade, AS&E has been extremely aggressive in litigation to protect what it perceives to be its exclusive technology and market, in particular with respect to technology used in mobile X-ray inspection systems. AS&E has been specifically very aggressive against L-3 and its predecessor entities.

10. In December 1995, AS&E brought a first suit against EG&G Astrophysics Research Corporation ("EG&G"), a predecessor in interest to L-3, for alleged trade secret misappropriation concerning technology later used by EG&G in a mobile X-ray inspection system, captioned American Science & Engineering, Inc. v. EG&G Astrophysics Research Corp., Civil Action No. 95-12649-DPW (D. Mass.) ("the 1995 Case"). That case was eventually settled and the parties stipulated to a dismissal without prejudice.

11. In September 1998, AS&E again sued EG&G, American Science & Engineering, Inc. v. EG&G Astrophysics Research Corp., Civil Action No. 98-11939-GAO (D. Mass.) ("the 1998 Case"), asserting the same trade secret misappropriation claim included in the 1995 Case, and also alleging infringement of a newly-issued patent, U.S. Patent No. 5,764,683 ("the '683 patent") directed to a mobile X-ray inspection system. EG&G counterclaimed for declarations of patent invalidity and noninfringement. That litigation finally ended last month when AS&E covenanted, with court approval, that it would never again assert the '683 patent (and another patent not at issue here)

against L-3 arising out of the manufacture, use, or sale of any past or present product by L-3 or its predecessors.

12. While the 1998 Case was pending, AS&E brought suit in February 1999 against the Commissioner of the United States Customs Service. American Science & Engineering, Inc. v. Kelly, Civil Action No. 99-10365-GAO (D. Mass.) (the "Customs Case"). This case concerned a proposal project that L-3's predecessor, EG&G, had bid. Once again, AS&E alleged that EG&G had misappropriated an alleged trade secret used in its mobile X-ray inspection system and that the Customs Service was using the alleged trade secret. EG&G intervened to ensure a proper defense against the claim and to assist the Customs Service. After extensive discovery and a multiple-day evidentiary preliminary injunction hearing, the court granted the Customs Service's motion to dismiss.

13. In addition to the 1995 Case, the Customs Case, and the 1998 Case, another of L-3's predecessors, Vivid Technologies, Inc. ("Vivid"), was also forced into patent litigation with AS&E. In 1996, based on threats from AS&E, Vivid brought a declaratory judgment suit against AS&E alleging that AS&E's U.S. Patent No. 5,253,283 was invalid and not infringed. Vivid Tech., Inc. v. American Science & Engineering, Inc., Civil Action No. 96-11059-REK (D. Mass.). The district court entered a claim construction ruling favorable to Vivid, which was upheld by the Federal Circuit, and the case was remanded. Vivid Tech. Inc. v. American Science & Engineering, Inc., 200 F.3d 795 (Fed. Cir. 1999). AS&E only recently agreed to dismiss the Vivid Case with prejudice as part of the settlement of the 1998 Case with L-3.

778939

14. With respect to U.S. Patent No. 6,292,533 ("the '533 patent"), AS&E has on several occasions, in writing and orally, expressed its position that L-3's transmission-only mobile systems, such as the CX-450M, infringe the '533 patent, and informed L-3 that it intended to assert that patent against L-3.

15. The first written threat to that effect that I am aware of appeared in a letter dated October 5, 2001 from AS&E's then General Counsel, Edwin L. Lewis, to Phil Ayers, who was the Assistant General Counsel for the former parent company of L-3, PerkinElmer, Inc. (A copy of the October 5, 2001 letter is attached as Ex. E). The October 5, 2001 letter was written in response to a settlement proposal from the lawyer (Kirk Teska) who was representing L-3's predecessor company, PerkinElmer Detection Systems, Inc. As a part of the settlement proposal, Mr. Teska had proposed that a release be given on "U.S. Patent No. 5,764,683, its reissue patent, and related patents including patents claiming priority to, or continuation, continuation-in-part or divisional applications from 5,764,683." The proposed release would therefore have covered U.S. Patent Nos. 5,903,623 and 6,292,533, the two patents on which the present declaratory judgment action was brought.

16. In the October 5, 2001 letter, written by AS&E's then General Counsel, Edwin L. Lewis, AS&E indicated that, because it had been issued a continuation patent covering "transmission imaging," it was demanding that PerkinElmer Detection Systems, Inc. "not use, sell, or offer to sell transmission detection in mobile truck x-ray inspection systems in the United States." It further threatened that, if AS&E was not selected as the purchaser of PerkinElmer Detection Systems, Inc., then whatever company was selected as the purchaser "would be restricted in its ability to use the [purchased] mobile x-ray

assets." (As discussed below, the company that was ultimately selected as the purchaser, and thus against whom these threats were directed, was L-3 Communications Corporation.) Finally, at the conclusion of the letter, Mr. Lewis proclaimed: "First and foremost, it is AS&E's responsibility to protect its intellectual property."

17. In another letter dated December 14, 2001, AS&E General Counsel Edwin Lewis wrote to PerkinElmer's General Counsel offering to settle both the EG&G and the Vivid litigation if PerkinElmer would agree to (1) covenant not to make, use, or sell any inspection system using scatter technology, and (2) pay AS&E a royalty for a non-exclusive license to what AS&E called its "suite" of MobileSearch™ patents. (A copy of the December 14, 2001 letter is attached as Ex. F). AS&E thus threatened to continue litigation against PerkinElmer if it did not agree to a royalty-bearing license on the entire family of MobileSearch patents (two of which are at issue in this case).

18. Despite these threats, PerkinElmer, Inc. did not sell PerkinElmer Detection Systems, Inc. to AS&E. Rather, in June of 2002, it sold that business to L-3 Communications Corporation. Thus, because the purchased company had indeed made, offered for sale, and sold a number of transmission-only mobile X-ray inspection systems like that described in AS&E's October 5, 2001 letter, and continues to do market these products today, a reasonable apprehension that AS&E would sue the acquired company on the transmission-only patents was created by AS&E's threats and continues to exist.

19. AS&E's threats continued. In a letter dated October 18, 2002 to L-3's counsel, Robert Abrahamsen, in connection with the litigation that was then pending between L-3 and AS&E. (A copy of the October 18, 2002 letter is attached as Ex. G). In that letter, AS&E not only informed L-3 of its position that sales of its transmission-only

6

778939

mobile X-ray inspection system were infringing, it expressly told L-3 that it would sue over such infringement.

20. In interrogatories served upon AS&E on October 22, 2002, L-3 asked AS&E, among other things, to identify the products sold by L-3 that it contended infringed the ASSERTED PATENTS. (A copy of those interrogatories are attached as Ex. H). The term ASSERTED PATENTS had been defined to included the '533 patent, as well as two other patents that had been named in the pleadings. On April 28, 2003, in response to those interrogatories (Response 15), AS&E stated that it contended L-3's CX-450M, which is and has always been a transmission-only mobile X-ray inspection system, infringed the named patents. (A copy of AS&E's responses are attached as Ex. I).

21. In the interim between receiving and responding to the above interrogatories from L-3, AS&E filed with the Court (on November 11, 2002) a motion to adopt a modified scheduling order (attached as Ex. J) and a proposed amended scheduling order (attached as Ex. K), each including the following statement:

> [I]t is AS&E's present intention to amend the complaint to add an additional patent infringement count in connection with another MobileSearch™ patent, U.S. Patent number 6,292,533, that issued to AS&E in September of 2001.

22. Five months later, On April 7, 2003, L-3 received a copy of a proposed settlement between AS&E and PerkinElmer, Inc., that had been executed on March 31, 2003. (Copies of the settlement agreement and accompanying cover letter are attached as Ex. L). L-3 had received no prior notice that such a settlement had been reached, and no one from AS&E had contacted me, or to my knowledge, anyone else at L-3, to engage L-3 in settlement discussions.

778939

23.   In that settlement agreement, which named L-3 as a third party beneficiary, L-3 received a release only under two of the patents in AS&E's MobileSearch patent family (the '683 and '533 patents), and not under the other two nearly identical patents (the '929 and '623 patents). That release, moreover, applied only to products that had been sold prior to June 14, 2002. The settlement agreement thus provided L-3 with no assurance that AS&E would not later bring suit under the '929 and '623 patents for sales that occurred prior to June 14, 2002, or under any of the four patents in the MobileSearch family for sales that occurred after June 14, 2002.

24.   On April 9, 2003, the date of a status hearing in the 1998 Case, I had a conversation with Edwin L. Lewis, AS&E's General Counsel, outside Judge O'Toole's courtroom. During that conversation, Mr. Lewis said AS&E had "a lot more patents" it would assert against L-3, and that L-3 should "come around soon" and pay AS&E a sum of money. AS&E's counsel made it clear to me that AS&E's position and threat was that L-3 infringed a number of additional patents from its MobileSearch patent family, and that unless L-3 acceded to AS&E's demands AS&E would assert such patents against L-3 in litigation.

25.   In the spring of 2003, I had several conversations with Cindy Caruso, who was identified at that time as the acting General Counsel. Ms. Caruso demanded that L-3 settle the claims of AS&E by agreeing to (1) consent not to make, use or sell any inspection system using scatter technology, (2) pay AS&E a royalty for a non-exclusive license to what AS&E called the "suite" of Mobile Search patents, and (3) acknowledge the validity of AS&E patents.

26. During the summer of 2003, I recall having several telephone conversations with Mr. William Grieco, who was represented to me as being the Acting General Counsel of AS&E. I was told that Ms. Caruso was on leave. During an initial call, Mr. Grieco invited me to meet him at AS&E's offices to discuss a possible resolution of the case. I agreed, and I met with him on or around July 10, 2003.

27. During the July meeting, Mr. Grieco informed me that AS&E's demands included a payment of money from L-3 and an acknowledgment by L-3 that it was infringing AS&E's MobileSearch patents and that those patents were valid. I don't recall the exact words that were used, but I am certain that Mr. Grieco's demands were directed to a "family" of "portfolio" or "suite" of AS&E's MobileSearch patents, and not merely to the two patents that had been asserted in the pending lawsuit. Mr. Grieco further informed me at that meeting that AS&E's chief technical officer was overseas at the time and that no one had looked into what products EG&G had been selling for quite some time. He told me that, frankly, AS&E was not interested in spending the time and money to conduct that kind of review. I walked away from that meeting with the clear understanding that AS&E was threatening to add its other MobileSearch patents to the suit, or file a new suit, at any time it wished. The fact that L-3 was selling the CX-450M was (and is) prominently displayed on L-3's web site. (A printout of the relevant pages from L-3's Website is attached as Ex. M).

28. Throughout September and the first half of October of 2003, after my lawyers had been pursuing discovery in view of an imminent discovery cut-off date in the 1998 Case, I received a number of phone calls from Mr. Grieco and Ms. Caruso, urging me to again engage in settlement discussions.

29.     On October 17, 2003, in response to these requests, I sent a settlement proposal to Ms. Caruso (A copy is attached as Ex. N). Under the proposal, AS&E would have (1) retrospectively released L-3 from infringement claims under any patents in the MobileSearch patent family, and (2) prospectively granted to L-3 a royalty-free license to those patents. In other words, L-3 was simply requesting assurance that it could go about its business without the fear of AS&E bringing yet another lawsuit, as it had repeatedly threatened to do.

30.     That letter did not state, as implied in paragraph 21 of Ms. Caruso's declaration, that L-3 had not sold any truck-mounted mobile X-ray inspection systems since June of 2002. Rather, it communicated only that L-3 had not sold any products since that time that could even arguably fall within the scope of the patents asserted in the 1998 Case (namely, the '683 and '511 patents), both of which required the use of scatter detectors. L-3 indeed had not sold any such systems that employed scatter detection since June of 2002.

31.     On October 24, 2003, I again met with AS&E's lawyers, Cindy Caruso, General Counsel, and William F. Grieco. At that meeting, AS&E initially demanded that L-3 pay money, agree not to sell systems using scatter technology and agree to the validity of AS&E patents. After I objected to this demand, Ms. Caruso and Mr. Grieco then suggested what they called a "walk-away," an idea that appealed to me in principle because, as I understood the concept, it sounded like it would assure L-3 of no further patent threats or suits. But Ms. Caruso and Mr. Grieco made it quite clear that they meant something very different. AS&E's proposal was that the parties grant each other, without any monetary payment, *retrospective* mutual releases – without any release or

covenant as to future activity. The other MobileSearch patents were specifically discussed at the meeting, but AS&E expressly refused to provide any assurance that it would not sue L-3 on the '533 or '623 patents. Ms. Caruso and Mr. Grieco did at one point float the idea of including the release of certain past claims with regard to the '533 patent, but this release would not have covered future sales and would not have covered the remainder of the patents in the MobileSearch patent family.

32. In a letter dated October 28, 2003, Ms. Caruso formally rejected the settlement offer of October 17, stating that AS&E would only agree to settle certain past claims under the '533 patent (as well as the Vivid litigation, which was effectively defunct in any event and had been dormant for three years). A copy of the October 28, 2003 letter is attached as Ex. O. Ms. Caruso further stated that AS&E would file a motion to dismiss if L-3 did not respond to the more limited settlement proposal by the end of that same day. Again, AS&E was continuing to hold over L-3's head the possibility of suit on other MobileSearch patents at some time of its own choosing.

33. In another follow-up letter on October 30, 2003, Ms. Caruso made this fact quite clear: She "acknowledge[d] that [AS&E's proposal] **does not address your goal of ensuring no future litigation between the parties**," and added that "**our intellectual property** represents a significant asset to AS&E that **requires protection**." (A copy of the October 30, 2003 letter is attached as Ex. P) (emphasis added). Once again, AS&E was quite clearly and expressly continuing to hold over L-3 the threat and risks of some "future litigation" on its "intellectual property" which as had previously been discussed at length included the entire suite of MobileSearch patents.

34. AS&E's consistent refusals to give L-3 any assurance that it would not be sued again under one or more of the other patents in that same family of closely-related patents left L-3 in continuing apprehension of suit. Moreover, AS&E's carefully-worded statements that it had "no present intent" to sue provided no reassurance, as that intent was not a covenant not to sue as I understand the Super Sack case law to require. Indeed, AS&E expressly refused to provide such a covenant. Moreover, it made it clear that its purported lack of present intent to sue was based on the absence of investigation and the erroneous belief that L-3 was no longer selling a truck-mounted transmission-only X-ray inspection system.

35. Ultimately, after two hearings before Judge O'Toole in February 2004 in which the Court indicated that AS&E could not terminate the 1998 litigation without providing a covenant not to sue L-3 with regard to any past or present products on any of the patents in suit in that case, AS&E ultimately did so. (A copy of the Stipulated Order of Dismissal and Covenants in which that agreement appears is attached as Exhibit Q). Accordingly, the threat of suit has been eliminated on those two patents (the '511 and '683), but not, of course, on the two presently in suit in this case.

36. I am puzzled by the statements made throughout the Declaration of Cynthia Caruso intimating that L-3 has not sold any truck-mounted X-ray inspection systems since June of 2002. To the contrary, L-3 has been continuously selling truck-mounted X-ray inspections systems, such as the CX-450M. Indeed, as noted above, such systems are prominently displayed on L-3's Website. (Ex. M).

37. While L-3 has not, since June of 2002, sold any truck-mounted mobile X-ray inspection systems that employ backscatter technology, such as would be required by

12

778939

the '511 and '683 patents (that were asserted in the 1998 case), it has been selling transmission-only systems all along. Neither I nor, to my knowledge, anyone else at L-3, has stated or implied to Ms. Caruso or anyone else at AS&E that L-3 ever ceased sales of such systems.

38.  For AS&E now to claim that L-3 has no cause to fear that AS&E will bring suit against those truck-mounted transmission-only X-ray inspection systems, as it repeatedly has threatened, in writing and orally, to do, is groundless. If AS&E truly has no intention to bring suit against those products, it can provide the necessary assurances, and moot this case, by making a legally-binding covenant to that effect (as it ultimately did, after two hearings before Judge O'Toole on this issue, in the 1998 case). Otherwise, L-3 will be left with a cloud of uncertainty and apprehension hanging over its head, which this declaratory judgment action is designed to resolve.

Dated: March 24, 2004

_____
Mark Stephen Syrnick

778939