1          UNITED STATES DISTRICT COURT FOR
                THE DISTRICT OF MASSACHUSETTS
2

3

4

5   AMERICAN SCIENCE AND ENGINEERING,     )
    INC.,                                  )
6                                          )  CA No. 98-11939-GAO
                    Plaintiff,             )
7   vs.                                    )
                                           )
8   EG&G ASTROPHYSICS RESEARCH             )
    CORPORATION,                           )
9                                          )
                    Defendant.             )
10

11

12          TRANSCRIPT OF STATUS CONFERENCE

13

14     BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.

15              United States District Court
             John J. Moakley U.S. Courthouse
16                 1 Courthouse Way
             Boston, Massachusetts  02210
17               February 11, 2004
                    2:05 p.m.
18

19

20                * * * * * * *

21

22              SHELLY M. KILLIAN, CM
                Official Court Reporter
23         John J. Moakley U.S. Courthouse
           1 Courthouse Way, Room 3510
24              Boston, MA  02210
                (617) 737-7117

25

EXHIBIT

_____1_____

Page 2

```
 1    APPEARANCES:

 2         For the Plaintiff:

 3              Erik Paul Belt, Esq.
                Bromberg & Sunstein
 4              125 Summer Street
                Boston, Massachusetts   02110
 5              (617) 443-9292

 6              Robert F. Daut, Esq.
                Eckert Seamans Cherin & Mellott
 7              One International Place, 18th Floor
                Boston, Massachusetts   02110
 8              (617) 342-6810

 9         For the Defendant:

10              Michael A. Albert, Esq.
                James Foster, Esq.
11              Robert M. Abrahamsen, Esq.
                Wolf, Greenfield & Sacks, PC
12              600 Atlantic Avenue
                Boston, Massachusetts   02110
13              (617) 720-3500

14

15

16

17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2              (The following proceedings were held in open court

3      before the Honorable George A. O'Toole, Jr., United States

4      District Judge, United States District Court, District of

5      Massachusetts, at the John J. Moakley United States Courthouse,

6      1 Courthouse Way, Boston, Massachusetts, on February 11, 2004.)

7              THE CLERK:  All rise.  United States District Court

8      for the District of Massachusetts, Court is now in session.

9      Please be seated.  Case of AS&E versus EG&G.  Docket No. CA

10     98-11939.

11             Would counsel please identify yourselves for the

12     record.

13             MR. BELT:  Yes, Erik Belt.  First of all, good

14     afternoon, your Honor.  Erik Belt from Bromberg & Sunstein, and

15     with me is Robert Daut from Eckert Seamans for AS&E.

16             MR. ALBERT:  Good afternoon, your Honor.  Michael

17     Albert and with me is Robert Abrahamsen of Wolf, Greenfield &

18     Sacks for EG&G, currently known as L-3 Communications.

19             THE COURT:  Good afternoon.

20             MR. BELT:  Thank you.  Your Honor, we did go back

21     and forth but we're still apart.  We weren't able to reach an

22     agreement.  Let me see if I can fairly state what the issue is

23     here.  We were willing to and desired to come up with a

24     concrete list of the products that we actually accused of

25     infringement in this case, and we named three products, which

1    were ones that were previously named in our interrogatories and

2    were the subject of the original lawsuit.  And those three

3    products were the Mobix system and something called CX-450M and

4    something called MTXR.  And we would certainly stipulate as to

5    those products as to the patents in suit and go away after

6    that.  What we thought was that the L-3 was being overly

7    broad.  We got back a list that was every product -- what

8    looked to us like every product in L-3's catalogue and, of

9    course, you know, a couple of things wrong with that.  One is

10   those are not the products, all of those products are ones that

11   were accused.  Indeed, not only that but they're not all the

12   products that were acquired from EG&G.  These are, you know,

13   separate products that L-3 had.  And we're not prepared to do

14   anything with those one way or the other.

15            And the second issue that rose was in addition to

16   wanting AS&E to stipulate as to the two patents in suit, which

17   are the '511 and the '683 patents, they wanted AS&E to

18   stipulate as to pretty much the whole family of patents, which

19   were never made part of this lawsuit.

20            So that's really, I think, where we are in terms of

21   the disagreement at this point.  We're still willing again to

22   stipulate as I've said.

23            THE COURT:  Okay.  Mr. Albert.

24            MR. ALBERT:  Yes, your Honor.  Thank you.  Where we

25   left things at the end of last week's hearing, as we recall, we

1    don't have the benefit of a transcript, but I think what was

2    made clear by the Court is we would go off and prepare a list

3    and what the point in contention that we had had last week was

4    whether, in fact, any release that they would offer us, any

5    covenant that they would offer us under Super Sack would have

6    to include all past and current products, and I believe the

7    Court indicated that it would, and we went off and we tried to

8    compile such a list, which we provided to AS&E counsel.  AS&E's

9    counsel came back and said, no, no, no, we're only going to

10   give you three items.  And, respectfully, where that leaves us

11   is we have a live controversy as to all of the other products.

12   The three items that they agreed to stipulate to were not all

13   the products they accused of infringement.  Part of the problem

14   we have here, first of all, is they never specified in their

15   discovery, and as your Honor knows there were pending discovery

16   disputes at the time this all came up, they never specified

17   what all the products were.  In the interrogatory answers they

18   listed three or four items and then said at least these.  So,

19   again, with the ten years of history of litigation between the

20   parties and the deliberate ambiguity as to what products were

21   or were not accused, we're left not knowing what they are.  The

22   key point as a matter of law, though, is they don't have the

23   right to get out of a case with a Super Sack statement that

24   just says we no longer accuse these particular products.  What

25   Super Sack and the other cases, Spectronics and Amana, every

... 

Page 6

1    single one of the Super Sack cases, as far as I'm aware, that

2    have been affirmed by the federal circuit have been releases in

3    which every product made by the defendant, past or current, has

4    been released.  And that is all that we're asking for here.  On

5    the issue of the list of products, that's where the parties

6    differ.  We gave them the list, and they want to restrict it to

7    a much, much shorter list.

8           There is a second issue that Mr. Belt mentioned,

9    and that is the related patents.  As your Honor may recall,

10   there are two original patents asserted in this case.  At some

11   point they then threatened to add some related patents.  These

12   are continuations, closely related patents that cover the same

13   basic area of technology, and that AS&E has repeatedly accused,

14   including recently, accused L-3 of infringing.  There is

15   clearly declaratory judgment jurisdiction as to those.

16           I think Mr. Belt is making a fairly technical point

17   which is, well, those additional patents have not been added to

18   this case.  Well, they may then simply be trading one case for

19   another rather than reaching the result that I think your Honor

20   was, and I think we were all hoping for, which is to put this

21   entire matter to rest because if they refuse to include those

22   in their Super Sack statement, we may have to be back here

23   tomorrow before your Honor with declaratory judgment action on

24   those other related patents because they're the subject of

25   threats that have never been removed by a Super Sack statement

1    and which they now appear to be saying they don't want to

2    remove with a Super Sack statement.

3         So we have a live controversy as to the related

4    patents. Whether it should be included as part of this case or

5    whether it has to be filed as a separate declaratory judgment

6    action is almost beside the point. It doesn't resolve the

7    issue. So these the two points of contention between the

8    parties.

9         I think as to the list of products, though, I think

10   Super Sack is really quite straight forward. It does say that

11   the reason that the case -- that the Court lacked declaratory

12   judgment jurisdiction was that a covenant had been made as to

13   any of its, that's the defendant's, past or present products.

14   And that's what L-3 is looking for here, a release, a covenant,

15   as to all of its past and present products so we know they no

16   longer accuse of them of infringement. If, in fact, there are

17   some products on that list that they don't believe were accused

18   of infringement and that they don't think infringe, then they

19   should have no objection to including them on the list of

20   products that they don't intend to sue us for infringement on.

21        THE COURT: Well, before I hear from Mr. Belt

22   again, my recollection of where we were when we last broke was

23   that the, if I remember -- let me just review what I remember

24   of the bidding. In response to my question, Mr. Belt said that

25   he would -- his client would make the same statement that the

1    Court found acceptable in Super Sack, which was that there was

2    an unconditional agreement not to sue for infringement as to

3    any of the patents in suit -- and here's the key phrase --

4    based on the products currently manufactured and sold.

5    Mr. Albert then raised the problem of not being sure what could

6    be defined as currently manufactured and sold in view of the

7    sporadic manufacture and sale of some of the products and

8    something just by the quirk of timing that would escape that

9    definition.  Thereupon the parties tried to solve that

10   definitional problem by being specific as to those products

11   which were -- which would meet the definition, the products

12   currently manufactured and sold.  That's where I think I left

13   the discussions.

14        MR. ALBERT:  And that's exactly what we tried to

15   do, your Honor.

16        THE COURT:  So from that point of view, then, in

17   one sense the catalogue of products is the universe of products

18   currently manufactured and sold.  Is that fair to say?

19        MR. BELT:  I don't know and I would have to hear

20   from Mr. Albert whether these are actually things that are

21   currently made and sold, but I guess that's fair to say.

22        THE COURT:  Whatever the fine tuning of that is,

23   going beyond the three that you've named, if there are products

24   that are, in fact, currently manufactured and sold and you are

25   willing to say I'm willing to forego anything that is currently

Page 9

1    manufactured and sold, why isn't it possible just -- it's like

2    to use a mathematics analogy, it's like currently manufactured

3    and sold is the variable, it the X in the equation.  And you

4    take that out and put the real number in.  The real number is

5    the list of products.

6         MR. ALBERT:  Currently or previously I assume your

7    Honor's referring to and that is, in fact, what we did.  Your

8    Honor had said products or technology.  So the list that we

9    gave them was the products, and there was three categories of

10   technologies that were included within that and that was the

11   list that we provided.

12        MR. BELT:  And I guess the problem from our point

13   of view was the technologies phrase was just too broad and

14   vague for us.

15        THE COURT:  Technologies might be a harder thing to

16   pin down.

17        MR. BELT:  Yeah.  We still want to pin this down,

18   and I suppose one way to do it is to say, you know, these

19   systems that we named, plus anything that was inherited from

20   EG&G after the acquisition and then fill in the Super Sack

21   formula and then I think we're okay.

22        MR. ALBERT:  It doesn't relate to whether it was

23   inherited by EG&G.  L-3 now stands in the shoes of EG&G and is

24   the party against whom all of the accusations have been made

25   since the acquisition in June of 2002.  So it's a list of all

1    the products that have been made previously or are currently

2    being made by L-3.

3            THE COURT:  Well, let me suggest the two patents,

4    let's stay with the two patents in suit, I don't have them in

5    front of me.  Remind me as to what they claim.

6            MR. BELT:  The '511 patent is dual imaging of back

7    scatter transmission and transmission.  Again, these are the

8    mobile detection systems, these large trucks.  The '683 is the

9    mobile platform for that.  So the '511 is the actual, you know,

10   x-ray detection.

11           THE COURT:  The whole apparatus basically?

12           MR. BELT:  Yeah, and the mode of display.  And the

13   other one is mounting it on the mobile platform is the simple

14   way to say it.

15           THE COURT:  Yeah, okay.  Well, then you can -- I

16   don't know whether it's true, but it might be true that having

17   the scope of the claims, you can decide -- you can match those

18   with products and figure out what's close and what isn't close,

19   I suppose, and narrow it down a little bit.

20           MR. ALBERT:  We were trying, your Honor, and that's

21   part of the discovery we never got the opportunity to take.  I

22   think the problem is that we end up --

23           THE COURT:  You can do that yourself, can't you?

24   You know what the claims are, and you know what you do.

25           MR. ALBERT:  Yes, your Honor, but we don't know

Page 11

1  what they believe that we do and that's wherein the problem

2  lies.  We never believed that we infringed or that these

3  patents were valid from day one, but their position is that

4  they are.  What Super Sack entitles us to is some assurance

5  that this isn't an ongoing controversy, that this will not be

6  brought back to us at some future time when the company has

7  further invested in these technologies and is further out on a

8  limb with regard to that.  And that's really the assurance

9  we're looking for.  The fact that they're not willing to

10  provide it unfortunately indicates that there really is an

11  ongoing controversy.

12            MR. BELT:  I think that's an overstatement.  I

13  don't think there's any controversy as to -- you know, a lot of

14  these products aren't even as far as we know, we can't tell

15  actually, the mobile truck apparatus that we originally accused

16  which is the Mobix system, and what we said in our

17  interrogatory was that we contend that at least EG&G's Mobix

18  system, which has also been known by other names, including

19  CX-450M, infringes one or more claims under these certain

20  patents.  And what we meant by that is very clearly the Mobix

21  system or whatever else you want to call it.  That's what we

22  contend it infringed.  We're willing to do that and, as I said,

23  we'll even throw in, just to eliminate the controversy all

24  together, products that were on EG&G's, you know, product list

25  when it was acquired.

1          MR. ALBERT:  What the federal circuit says is that

2     this is exactly what a party cannot do.  They cannot make a

3     threat, hang it over the head of the competitor, interfere with

4     their business, and then pull back just far enough to say,

5     okay, we no longer accuse this product or that product and as

6     for the rest, well, we just don't know.  They have to go

7     further.  They have to expressly covenant not to sue on them.

8          MR. BELT:  And I think that's what we're trying to

9     do here.  We are presently trying to covenant not to sue with

10    respect to any present activity, any past activity up through

11    today or whatever the date is of the order or the document.

12         MR. ALBERT:  That's what our list would do, and

13    that's what they, as I understood it, were refusing to sign.

14         MR. BELT:  Can I have one moment with my client?

15    Thank you.

16         (Pause.)

17         MR. BELT:  We can, your Honor, covenant with

18    respect to that whole list of products, including L-3 products

19    with respect to these two patents.

20         MR. ALBERT:  Well, that resolves issue one.  We're

21    now left with issue two, which is are they simply trading one

22    lawsuit for another?  These are closely related patents that

23    they've repeatedly threatened suit on, including this very

24    case.  They've threatened -- we have a letter here in which

25    they threatened to add to this case.  They didn't do that by

1   their deadline, but the threats have been ongoing, both oral

2   and written, and there would clearly be declaratory judgment

3   jurisdiction.  And if the procedural avenue that needs to be

4   followed is that we simply need to return to the Court tomorrow

5   with a declaratory judgment action on that, I hope everyone

6   would agree that that's an inefficient approach to this and

7   that they should simply agree if they don't, in fact, intend to

8   pursue those patents, that they include them in the Super Sack

9   statement.

10                  MR. BELT:  If I may, your Honor, the third patent

11  we're talking about is the '533 patent, and there are three

12  things wrong with that argument.  I think the letter that

13  Mr. Albert is referring to was from October of 2002, which is

14  significant for a couple reasons.  It's a year and a half ago,

15  and we've never added that patent to the case.  Number two is

16  since that time we've settled with the EG&G and its former

17  parent, PerkinElmer, and indeed in that settlement agreement we

18  released them from all claims up through that point of

19  infringing that '533 patent as well.  And in terms of the

20  declaratory judgment, under the two-prong test stated by the

21  federal circuit --

22                  THE COURT:  Was that a mutual release?

23                  MR. BELT:  Yes.

24                  THE COURT:  And this is a minor point in this mix,

25  did that release extinguish the claim for intentional

1    interference that related to the Commerce Department?

2            MR. BELT:  It did, yeah.

3            THE COURT:  Customs Department, Customs Bureau.  So

4    that claim is gone.  The counterclaims at issue here are

5    declaratory judgment.

6            MR. ALBERT:  Technically, your Honor, it actually

7    only released any of those claims, I believe, through the date

8    of that release or there was a date referenced in the release.

9            THE COURT:  The intentional interference with

10   business relations was about a specific historic series of

11   events, which were the interference with the Customs Service

12   development and so on.

13           MR. ALBERT:  Yes, your Honor.

14           THE COURT:  So that would have been released.

15           MR. ALBERT:  And our proposal to them included a

16   release of that.

17           THE COURT:  I just wanted to clarify that the

18   counterclaims that are alive and at issue are nonvalidity, and

19   so on, patent counterclaims and declaratory judgment and not

20   that coerceive action for tort damages for the historical

21   events.

22           MR. BELT:  That is correct.

23           THE COURT:  I interrupted you on the narrative.

24           MR. BELT:  I'm sorry.  The two prongs of the

25   declaratory judgment is an imminent threat.  There isn't an

1    imminent threat.  We haven't made one.  The one that was made

2    in October of 2002 is ancient history and was resolved, I

3    think, by at that settlement agreement that came in May of

4    2003.

5              Secondly, it still comes down to the second prong,

6    which is even if there's a threat, there's no present activity

7    and I still haven't heard that they're making, using, selling

8    or have products on order.  So I can't bring that kind of

9    infringement case and I don't think there's any intention to at

10   this point and my client is confirming that.

11             THE COURT:  Well, here's my view on that.  It's an

12   imperfect world.  I think that a reasonable place to draw the

13   line for these purposes is at this controversy.  I don't think

14   that there's enough of a current controversy to include other

15   patents.  I recognize that the cost of this is the possibility

16   sometime the threat will become real enough that you'll be back

17   and fighting again, but I think for this controversy and the

18   present issues, whether the claims that have been asserted here

19   can be disposed of as proposed on the undertaking that is now

20   emerging today, even though the parties have commercial

21   interest and perhaps intellectual property rights which could

22   tangle them up again in the future, I don't think that's

23   enough.  So the second issue I'm not particularly persuaded

24   that should hold things up, as long as there's tightness on the

25   first issue.

Page 16

1         MR. ALBERT:  If that's the Court's resolution, I

2    certainly understand that, your Honor.  Just to be clear, and I

3    tried to make this clear prior to the hearing, because I

4    thought that AS&E and its counsel were indicating that they

5    wanted to get a global resolution of everything, we are going

6    to be facing the situation very shortly, then, of having to be

7    back here on the issue of the more recent threats, which I

8    respectfully disagree with my Brother's characterization of,

9    but it may be a different case which the Court would have to

10   resolve on its own facts.

11        THE COURT:  I think that may be, if it happens.

12   And although it is a plurality of litigations, it at least will

13   have its own focus.  So if you want to look for a silver lining

14   someplace.  I just observe that the existence of a patent is a

15   kind of threat all by itself.  So there's a question of where

16   on this line you make a stand.

17        MR. ALBERT:  This certainly went far beyond that.

18   There were express threats.

19        THE COURT:  I understand, I understand.  There's

20   always, as long as somebody thinks they've got some monopoly,

21   there's going to be some bumping of elbows.

22        MR. ALBERT:  Certainly.

23        THE COURT:  So I think we're there.  Because you

24   will make the global assertion on point one with respect to the

25   current product list, I guess.

1          MR. BELT:  Yes, yes.

2          THE COURT:  And upon that, I will grant the motion

3    to dismiss the claims with prejudice and the counterclaims

4    without prejudice.

5          MR. ALBERT:  Yes, sir.

6          MR. BELT:  Yes, your Honor.  I think that's

7    acceptable.

8          THE COURT:  Okay.  Shall we do that right now?

9          MR. BELT:  Absolutely.

10         THE COURT:  Or do you need to sit down with pencil

11   and paper and make sure you have the list?  You know what the

12   list is.

13         MR. ALBERT:  We have the list.  We may need to put

14   into writing what your Honor just said, but it's the same list

15   that we gave him earlier.

16         MR. BELT:  We can read it right into the record and

17   do it right here.

18         THE COURT:  If you want to do that or if you want

19   to make a filing.  These are publicly offered products so

20   there's no confidentiality involved.

21         MR. ALBERT:  I'd rather make a filing to make sure

22   we have clearly in writing what we just agreed to.

23         THE COURT:  The only disadvantage to that is I'm

24   not sure I want to let you out of my sight.

25         MR. ALBERT:  Good point, your Honor.  We always

Page 18

1    seem to do better here than outside the courtroom.

2              MR. BELT:  Can we just read these into the record?

3    Is that the easiest way, the list that you have here?

4              MR. ALBERT:  Perhaps we should adjourn to another

5    room and try to --

6              THE COURT:  I think it's clear enough.  Let's put

7    it probation and think that you'll be able to do it.  If not,

8    we'll have you back.  Do your best, file it.  If you really are

9    at loggerheads, we'll come back.

10             MR. ALBERT:  Thank you, your Honor.

11             MR. BELT:  Thank you, your Honor.

12             THE COURT:  But I think a prepared writing filed

13   and the papers will be fine, then that will be followed by an

14   order.

15             MR. ALBERT:  That's great.  Thank you.

16             MR. BELT:  Thank you.

17             THE COURT:  The Clerk suggests a deadline.  It

18   shouldn't be long, you're right there.  How about by Friday?

19             MR. BELT:  Yeah.

20             THE COURT:  Might as well just sit right down and

21   do it.

22             MR. ALBERT:  Thank you.

23             THE CLERK:  All rise.  Court will take a short

24   recess.

25             (Adjourned at 2:27 p.m.)

Page 19

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3      transcript of the record of proceedings in the above¡entitled

4      matter to the best of my skill and ability.

5

6

7

8      _____      _____

9      Shelly M. Killian                      Date

10     Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25