```
 1                UNITED STATES DISTRICT COURT FOR
                    THE DISTRICT OF MASSACHUSETTS
 2

 3

 4

 5   AMERICAN SCIENCE AND ENGINEERING,    )
     INC.,                                )
 6                                        )   CA No. 98-11939-GAO
                    Plaintiff,            )
 7   vs.                                  )
                                          )
 8   EG&G ASTROPHYSICS RESEARCH           )
     CORPORATION,                         )
 9                                        )
                    Defendant.            )
10

11

12              TRANSCRIPT OF MOTION TO DISMISS

13

14         BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.

15              United States District Court
                John J. Moakley U.S. Courthouse
16                    1 Courthouse Way
               Boston, Massachusetts  02210
17                    February 4, 2004
                         2:22 p.m.
18

19
                        *  *  *  *  *  *  *
20

21
                    SHELLY M. KILLIAN, CM
22                   Official Court Reporter
                 John J. Moakley U.S. Courthouse
23               1 Courthouse Way, Room 3510
                      Boston, MA  02210
24                     (617) 737-7117

25
```

EXHIBIT 2

```
 1    APPEARANCES:

 2        For the Plaintiff:

 3            Erik Paul Belt, Esq.
              Bromberg & Sunstein
 4            125 Summer Street
              Boston, Massachusetts  02110
 5            (617) 443-9292

 6            Robert F. Daut, Esq.
              Eckert Seamans Cherin & Mellott
 7            One International Place, 18th Floor
              Boston, Massachusetts  02110
 8            (617) 342-6810

 9        For the Defendant:

10            Michael A. Albert, Esq.
              James Foster, Esq.
11            Robert M. Abrahamsen, Esq.
              Wolf, Greenfield & Sacks, PC
12            600 Atlantic Avenue
              Boston, Massachusetts  02110
13            (617) 720-3500

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3     before the Honorable George A. O'Toole, Jr., United States
 4     District Judge, United States District Court, District of
 5     Massachusetts, at the John J. Moakley United States Courthouse,
 6     1 Courthouse Way, Boston, Massachusetts, on February 4, 2004.)
 7              THE CLERK:  Next up on the calendar is AS&E versus
 8     EG&G Astrophysics, Docket No. 98-11939.
 9              Would counsel please identify yourselves for the
10     record.
11              MR. BELT:  Erik Belt of Bromberg & Sunstein for
12     AS&E.
13              MR. DAUT:  Robert Daut of Eckert Seamans Cherin &
14     Mellott on behalf of AS&E.
15              MR. ALBERT:  Good afternoon, your Honor.  Michael
16     Albert of Wolf, Greenfield & Sacks.  With me are James Foster
17     and Robert Abrahamsen for the defendants, formerly known as
18     EG&G, now known as L-3 Communications.
19              THE COURT:  Okay.  The primary business, I think,
20     is the motion to dismiss, and so we have some discovery issues
21     we may or may not get to.
22              MR. BELT:  Good afternoon, your Honor.  Thank you.
23     Should I begin addressing that?
24              THE COURT:  Yes, please.
25              MR. BELT:  Okay, thank you.  Well, very simply,
```

1  your Honor, the reason we filed this motion to dismiss is we
2  settled the case.
3            In our view, we settled the claims that we brought
4  against the entity that we accused of the wrongful conduct
5  here, the patent infringement and the misappropriation of trade
6  secrets. And that settlement was concluded, I believe, in May
7  of 2003, so last spring. And that settlement was with EG&G,
8  the defendant that we had sued, and its then corporate parent,
9  PerkinElmer. Releases are exchanged, all the claims up through
10 a certain date are dismissed, are released with each other.
11           Now, what's happened is that at some point, your
12 Honor, and I believe it was June of 2002, EG&G changed hands.
13 It went from being owned by PerkinElmer to being owned by L-3.
14 We tried to engage L-3 in the settlement discussions at that
15 time, they declined.
16           THE COURT: The change of ownership was June or so
17 2002?
18           MR. BELT: It was June of 2002.
19           THE COURT: The settlement was when?
20           MR. BELT: It was concluded in May of 2003. And
21 what was released, your Honor, is as to the former entity, EG&G
22 and its corporate parent, all claims are released -- well, it
23 actually works two different ways. There are certain claims,
24 all of which are released up through the effective date of that
25 settlement agreement. Other claims as to certain parties are

1  released as through June I think it's 14, 2002. And that was
2  the date of the changover from one corporate parent to
3  another.
4         So after the settlement is concluded, what AS&E
5  does is say, okay, is the conduct that we accused of
6  infringement, is the wrongful conduct continuing? We did our
7  investigation. And the investigation consists of, for example,
8  this is a relatively small industry, you know, our field reps
9  are going to know when these big trucks that are being accused
10 of infringement are being sold out there. As far as we could
11 tell from our investigation, the conduct that we were concerned
12 about was not continuing. So as far as we know and as far as
13 we're concerned, we don't have a case now of infringement and
14 that's why we've moved to dismiss.
15         THE COURT: I don't want to get too far into the
16 technical details, but what was the conduct that was
17 infringing? Was it the use of a collimator and back scatter
18 technology? Is that what it was?
19         MR. BELT: Well, I think you do know a little bit
20 about this. Your Honor, yeah, that was part of it, and I think
21 that involved part of the trade secret claims but there are
22 also two patents involved in this case. And generally they
23 involve these mobile detection systems that are essentially
24 these trucks that use the various x-ray technologies to detect
25 contraband.

1    THE COURT: Well, what I'm getting at is have the
2    products changed, or have you changed your view as to whether
3    the products fall within the range of what's claimed in the
4    patents?
5    MR. BELT: Well, I think our view is this, your
6    Honor, is that those products that we were worried about are no
7    longer being sold. They're not out there in the market.
8    They're not there. There were certain of the trucks that were
9    sold, we brought our suit, we've now resolved those claims
10   against -- satisfactorily to us and to EG&G and its then
11   corporate parent. So --
12   THE COURT: And are they not being sold because
13   they've been replaced by equivalent products, or are they not
14   being sold because nobody can get a buyer for them but they
15   would be sold if they could find somebody interested?
16   MR. BELT: That I don't know, your Honor. We just
17   know they're not being sold. Because we released all claims up
18   and through last year, there really -- we don't know of any
19   infringing activity since then, we can't in good faith bring
20   the claim. So we're in the position where we have to withdraw
21   our infringement claims. Now, what that does, your Honor, is
22   that divests the Court of jurisdiction to hear the declaratory
23   judgment counterclaims.
24   The federal circuit, which would, you know, govern
25   this issue here says, you know, to support a declaratory

1   judgment counterclaim of patent invalidity or patent
2   noninfringement, there's a two-prong test.  And that two-prong
3   test is very simply that you have, number one, a reasonable
4   apprehension -- and this is the accused infringer -- has a
5   reasonable apprehension of being sued.  And of course here we
6   say we've released all the past claims so you're not going to
7   be sued for anything up and through that date, and as to
8   anything going forward, we don't see any infringement so we're
9   not going to sue you for that through the present.  And I'll
10  file what I need to file, release or what have you, as to
11  anything up through today.
12              THE COURT:  Are you willing to make the same
13  unequivocal statement that Super Sack made?  This is what it
14  says:  Super Sack will unconditionally agree not to sue the
15  defendant there for infringement as to any claim of the patents
16  in suit based upon the products currently manufactured and sold
17  by the defendant.
18              MR. BELT:  Absolutely without reservation.  And I
19  think that really is the end of it, your Honor.  The second
20  prong of the test is is there present activity?  As far as we
21  can tell there isn't.  I haven't heard anything different.  So
22  the current entity, L-3, would have the burden of proving each
23  of those two prongs of the test.  I don't see it there.  And,
24  you know, for the life of me I can't figure out if we are
25  saying, you know, we give up, we will absolutely not sue you

1  through today and we'll give the covenant or whatever we need
2  to draw up or just my statement in open court I think would be
3  enough based on some of the cases we've cited to you, it seems
4  like this case should go away and end.
5      THE COURT: All right. Mr. Albert?
6      MR. ALBERT: Thank you, your Honor. There are a
7  number of areas, not surprisingly, where we disagree with what
8  Mr. Belt just said. In particular, the Declaratory Judgment
9  Act does not and the cases decided under it do not provide that
10 the Court is divested of jurisdiction when the plaintiff simply
11 says, well, at the present time we're not aware of any
12 infringement and, therefore, we're going to unilaterally choose
13 to withdraw their claims. What they did in their initial
14 motion to dismiss was basically say we would like to withdraw
15 our claims without prejudice.
16     THE COURT: Yeah, but they've moved off that.
17     MR. ALBERT: They moved off that. What's clear
18 there is that they couldn't do that. Then in their reply brief
19 they came back and said maybe we do have to go a little
20 further, and they went a little further. And what they said
21 was we will not assert claims through the present. Now, the
22 problem with that is that does not meet the Super Sack test,
23 and I'll address in a moment whether what Mr. Belt has just
24 said does. I still don't believe it does for reasons I'll
25 explain.

1        But what they said in their reply brief was we will
2   agree not to sue you for activities through the present. Now,
3   that specifically does not resolve the problem. The problem is
4   there have been past sales, and there is an ongoing willingness
5   to make sales of product that they have continually over some
6   ten years now accused of infringement. In no negotiation, in
7   no discussion, have they ever stated that they would bind
8   themselves to the position that they will not accuse L-3's
9   products of infringement.
10       What they said in the reply brief is we'll release
11  you through the present. What they had said in the settlement
12  agreement, which Mr. Belt referred to which was entered into
13  with the predecessor entity, PerkinElmer, is that they would
14  release us from claims for products sold through June of 2002.
15  In each step they're changing the date. What they're not doing
16  is releasing the cloud that hangs over L-3's head that if it
17  resumes selling or continues to sell or tomorrow accepts a
18  purchase order to sell one of these products, that it won't be
19  sued for that. And what Super Sack makes quite clear is that
20  that's what they're not permitted to do.
21       Now, I'd like to address the statement that
22  Mr. Belt just made because Super Sack is a situation, as are
23  most of the cases in which the federal circuit has addressed
24  this issue, in which we're talking about products that are
25  essentially rolling off an assembly line on a regular basis.

1    That's not the kind of product we have here.  These are
2    made-to-order products.  They're big ticket items, seven-figure
3    items typically, and so they're not made every day.  They're
4    made when an order comes in.  So for Mr. Belt to say that he
5    will agree not to sue for products currently being made, I
6    think with all respect continues to be ambiguous as to the
7    concern L-3 has, which is past products.  And, in fact, that
8    L-3 would like to have the option of continuing to offer for
9    sale or sell.

What Super Sack says is Super Sack promises -- this
11   is page 1055 of 57 F.3rd.  Super Sack's promise to assert
12   neither the '796 patent nor the '652 patent against Chase as to
13   any of its past or present products precludes the existence of
14   an actual controversy.  And, again, they reaffirm that point on
15   the bottom of page 1056 saying that the promise must extend to
16   products that Chase made -- quote -- made, used, or sold on or
17   before the date in question.  So one area in which there's been
18   a lack of clarity is whether they're irrevocably committing not
19   to sue on products that L-3 has made in the past and may wish
20   to continue making.

21            The other problem is quite simply the fact that
22   there is an ongoing cloud of litigation from the numerous cases
23   that have been filed by AS&E against L-3 and its predecessors.
24   There are now four cases that have addressed these issues.  In
25   one of those cases they asked your Honor to dismiss it without

1  prejudice. The Court denied that motion, and here we are back
2  again today. L-3 has for the past ten years been faced with a
3  barrage of threats to suit over these patents, and it's
4  entitled under the Declaratory Judgment Act to bring that to a
5  final resolution to establish they're not infringing and that
6  the patents are invalid.
7              THE COURT: If you could rewrite the Super Sack
8  formula to satisfy you, what would it say?
9              MR. ALBERT: Well, one thing that it would need to
10 say is AS&E irrevocably releases L-3 -- I'm not trying to draft
11 language here, I'll do it on the fly as best I can, your
12 Honor -- for all sales past, present, and future under the
13 patents in suit.
14             THE COURT: I think that goes beyond what Super
15 Sack says.
16             MR. ALBERT: With regard to products that L-3 has
17 made either in the past or currently.
18             THE COURT: It seems to me that the problem you
19 have as applied to what may be the facts in this case, the
20 "currently manufactured and sold" phrase because it may be
21 difficult in a case where there are custom manufactured
22 products to be clear about it, where there might not be any
23 product currently being manufactured in that sense, although it
24 was before and the very same thing might be next year. And
25 similar with sales, if they're sporadic rather than sort of

1   general marketing kinds of things.  So the question would be if
2   the stipulation could extend to identifying a particular
3   generation of products, or whatever, whether or not they're
4   currently being manufactured or sold.
5               MR. BELT:  If I may, your Honor, we could do
6   something like this, and this is again a suggestion on the fly,
7   based on any orders received up until today or whatever the
8   date is that this piece of paper got signed.
9               THE COURT:  Are you going to be upset to the point
10  of suing them if business turns for them and they get somebody
11  who wants to order something that they were willing to make for
12  people in 2000?
13              MR. BELT:  Well, again, I don't --
14              THE COURT:  You then would have said infringed your
15  patents.
16              MR. BELT:  Are we talking about a product that we
17  had accused of infringement previously?
18              THE COURT:  Yeah.  I guess so, yeah.
19              MR. BELT:  It's very speculative and I think what
20  Super Sack says, your Honor, is at page 1060 the residual
21  possibility -- and I'm quoting here -- the residual possibility
22  of a future infringement suit based on Chase's future acts is
23  simply too speculative a basis for jurisdiction over Chase's
24  counterclaim for declaratory judgment and validity.
25              THE COURT:  This is a mix of future and past,

1  that's the problem. So there was a truck that they wanted to
2  make and sell to the Customs Service, right? If they now get
3  an order for that next year, that same device, truck, that you
4  once said infringed, will you sue them for that next year or
5  are you willing to be foreclosed from suing them for that next
6  year? That's the question.
7          MR. BELT: Could I have one minute with general
8  counsel of my firm?
9          THE COURT: Yes.
10         MR. ALBERT: Your Honor, if I could just suggest
11 one of the problems we have here is this attempt to sort of
12 negotiate a settlement agreement is what should have happened,
13 I think, out of court, and the attempt to use this forum as a
14 means to try to negotiate language is really not the approach
15 that's suggested by the precedent.
16         MR. BELT: I'm sorry. When I was conferring, I
17 didn't quite hear what Mr. Albert said, but I think that we can
18 say that we would not sue on these patents for -- is it the
19 Mobix system? Is that the product?
20         MR. ALBERT: Again, that is one of the products
21 that you accused of infringement. The problem we have, what I
22 was addressing a moment ago, was the fact that there are
23 ambiguities here that need to be reduced for writing as to, for
24 example, what exactly are the products that they are accusing
25 of infringement so that we're clear that we have had the cloud

1   removed as to any product that may have been at issue.

2       MR. BELT: I think that's easy because we had filed
3   an interrogatory --

4       THE COURT: I'll tell what you we'll do. We have
5   another case. We'll take a recess in this case. You guys go
6   out there and see if you can agree on the exact products, we'll
7   hear the other case, and then we'll resume. And if you can't,
8   you can't. I'm not trying to -- I'm not trying too hard to
9   knuckle you, but I do think we're at a point where a little
10  push and give and we may resolve this to everybody's
11  satisfaction. So let's take a short break in this one, we'll
12  hear the next case.

13      (Recess taken at 2:38 p.m.)

14      (Resumed at 3:05 p.m.)

15      THE CLERK: Back up on the docket is AmErikan
16  Science versus EG&G.

17      THE COURT: How did we do?

18      MR. BELT: I think we -- may I speak? Thank you.
19  I think we made some progress, but while we were just sitting
20  back here, I just noticed a formula in Super Sack that may also
21  do the trick, and I'll read it and see if this does the trick.
22  In short, although Chase may have some cause to fear
23  infringement suit under the two patents in suit based on
24  products that it may develop in the future, Chase has no cause
25  for concern that it can be held liable for any infringing acts

1   involving products that it made, sold, or used on or before the
2   date that the motion to dismiss in that case was filed.  That's
3   at page 1059.
4           So if it's acceptable, we can say for anything that
5   L-3 has made, used, or sold previously up through the date of
6   today, then we would not sue them on the two patents in suit
7   here.  And just so I'm clear about that, that means that if one
8   of those products that it's ever made, used, or sold in the
9   past, if a year from now Saudi Arabia says, yeah, I want that
10  product that you used to have available in 2000, we won't sue
11  on that.  Is that a reasonable formulation?
12          MR. ALBERT:  Well, let me start by saying what we
13  did agree on when we were outside, which was that we would come
14  and represent to the Court that our understanding is that the
15  parties think that they can reach a resolution by coming up
16  with a list of product lines that would be covered by a
17  release, and the intent was to ask the Court for some time
18  period within which to do that.  That's what I thought we
19  agreed we were going to ask the Court.
20          MR. BELT:  And that's true.  I just happened to see
21  this as we were sitting there.
22          MR. ALBERT:  So I'm not prepared to respond on the
23  fly to whether that particular language would do it.  I suggest
24  we stick to our original approach, which is we take some
25  reasonable period of time that the Court can set to see if we

1    can reduce to writing what we are willing to agree to and that
2    may resolve it.
3             THE COURT:  That suggestion has appeal to me
4    because I think the more concrete the expression, the less
5    uncertain it will be and, therefore, the less nervous people
6    will be justifiably about its reach.  So if it is -- if it can
7    be specific to particular technologies, products, whatever you
8    want -- however you want to be specific, I think that will
9    increase the -- put another way, will decrease the potential
10   for ambiguity and, therefore, make it more of a bright line
11   that can be followed.
12            MR. BELT:  Right, your Honor.  And I think we had
13   suggested maybe a period of seven days or something to that
14   effect.
15            MR. ALBERT:  Some reasonable period.
16            MR. BELT:  Maybe till like next Thursday just
17   because it's late in the afternoon.  I think that's the 12th.
18            Your Honor, one way to handle it so that you don't
19   have to have us back necessarily is just to do a -- we could
20   submit a paper to you by a certain date; and if we can't agree
21   by that date, then we'll just submit the --
22            THE COURT:  Well, what I would like to do is -- no,
23   I'd like to have you come back.
24            MR. BELT:  Okay.
25            THE COURT:  Unless whatever you submit resolves it

1  entirely.  But the default position will be you'll show up.
2  And you can get out of that by a full agreement, but
3  otherwise -- so I'd like to put it into a date.
4           Day before?
5           THE CLERK:  That's what I'm looking at.  Wednesday,
6  February 11th at 2 p.m., be back here.
7           MR. BELT:  That's great.
8           MR. ALBERT:  Yes, your Honor.
9           THE COURT:  Thank you, your Honor.
10          THE CLERK:  All rise.  Court is in recess.
11          (Adjourned 3:09 p.m.)
12
13                   i i i i i i
14                   CERTIFICATION
15      I certify that the foregoing is a correct
16  transcript of the record of proceedings in the above¡entitled
17  matter to the best of my skill and ability.
18
19
20
21  _____         _____
22  Shelly M. Killian                              Date
23  Official Court Reporter
24
25