UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                                              )
L-3 COMMUNICATIONS SECURITY AND            )
DETECTION SYSTEMS CORPORATION              )
DELAWARE                                                          )
                                                                              )   Civil Action No. 04-10339-RWZ
            Plaintiff and Counter-defendant       )
                                                                              )
                        v.                                                )
                                                                              )
AMERICAN SCIENCE & ENGINEERING, INC.   )
                                                                              )
            Defendant and Counterclaimant       )
_____)

**AS&E's MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
FOR LACK OF JURISDICTION, FOR ATTORNEYS' FEES, AND
TO STAY ALL PROCEEDINGS**

American Science & Engineering ("AS&E") has done everything it could to avoid this unnecessary litigation, to temper its fury, and, once in play, to get it dismissed. Back in February 2004, when the declaratory judgment plaintiff, L-3 Communications Security and Detection Systems Corporation ("L-3"), filed this litigation, AS&E was not threatening to sue L-3. AS&E made that clear when it moved to dismiss this case in March 2004. Indeed, at the time, AS&E stated that it made no business sense to pursue litigation, and nothing that it has learned since then in this litigation has changed AS&E's mind. So it is frustrating that L-3 has continued to pursue this case aggressively, even while AS&E has been attempting to end it. By filing this motion to dismiss now, AS&E seeks to spare the Court from further pointless litigation and to save both parties from incurring additional and unnecessary costs.

AS&E has now offered what L-3 originally wanted in March 2004--namely, a so-called *Super Sack* statement (*i.e.*, a covenant not to sue). A duly signed covenant not to sue is attached as Exhibit A. But L-3 is being greedy and wants more. L-3's stance confirms AS&E's original

suspicions, voiced in its March 2004 motion to dismiss, that L-3 trumped up this declaratory judgment action only to negotiate more than it deserves--in this case, free licenses to patents not at issue here and which AS&E has never asserted against L-3. That use of the legal process to improve a negotiating position is improper and should be sanctioned. Accordingly, this Court should dismiss all claims and counterclaims in this case and sanction L-3 by awarding AS&E its attorneys' fees and costs associated with having to defend against this needless litigation.

## BACKGROUND FACTS

**A.     The Parties, Patents, and Products at Issue**

AS&E owns U.S. Patent Nos. 5,903,623 and 6,292,533 (the "AS&E Patents"). The AS&E Patents are directed to mobile x-ray inspection systems--for example, x-ray inspection systems mounted on trucks. AS&E makes and sells such truck-based x-ray inspection systems under the "MobileSearch" brand name. These systems are typically deployed at, *e.g.*, border crossings or ports and are used for scanning cargo and other large objects, such as trucks, shipping containers, and other vehicles.

L-3 came into existence in or about June 2002, after its parent company, L-3 Communications, purchased the x-ray inspection business of PerkinElmer Inc. PerkinElmer, in turn, had purchased the business from EG&G Astrophysics. Thus, L-3 traces its roots back to the x-ray inspection business of EG&G. L-3 makes a variety of x-ray inspection systems, the majority of which have nothing to do with the mobile x-ray inspection systems claimed in the AS&E Patents. Nonetheless, as L-3 stated when it opposed AS&E's original motion to dismiss in March 2004, L-3 does make and sell a limited line of truck-mounted systems:

> L-3 sells truck-mounted, <u>transmission-only</u> imaging systems, resembling in some respects the system disclosed in the AS&E patents, and has been offering for sale and selling such systems for some time. One such system currently marketed by L-3 is called the CX-450M.

*Plaintiff's Opposition to Defendant AS&E's Motion to Dismiss for Lack of Actual Controversy*, dated March 24, 2004 [D.N. 7], at 6 (emphasis added).

In addition to the CX-450M, identified in L-3's statement above, L-3 also makes and sells (or has made and sold) two other models of truck-mounted x-ray inspection systems-- namely, the CX-2500M and the CX-3800M. Print-outs from L-3's website describing these products are attached at Exhibit B.  These products are essentially the same as the CX-450M, except that they use a higher energy x-ray source for greater x-ray penetration of the cargo being scanned. (The designations "450," "2500," and "3800" refer to the energy level of the x-rays.) All three models are "transmission-only" systems, meaning they employ a particular type of x-ray detection.  In response to AS&E's discovery requests, L-3 has identified only these three models of truck-mounted x-ray inspection systems.  AS&E is not aware of any other models.[1]

When L-3 opposed AS&E's motion to dismiss back in March 2004, L-3 made clear that it feared suit only against its transmission-only systems.  For example:

    a.    "In that letter [of October 5, 2001], AS&E made very clear that . . . AS&E intended to enforce its intellectual property rights relating to <u>transmission-only</u> mobile X-ray inspection systems against PerkinElmer Detection systems and against any successor entities [*i.e.*, L-3]."  *Plaintiff's Opposition to Defendant*

---

[1] Another type of x-ray detection technology is known as "backscatter" detection. Certain claims of AS&E's '623 patent, at issue in the current litigation, require backscatter detection. L-3 moved to invalidate those claims, among others, under the on-sale bar, and this Court granted that motion. But as AS&E has consistently argued, this case has all along been about L-3's transmission-only products--the only kind that L-3 makes and sells.  Thus, AS&E could not possibly have threatened suit against non-existent backscatter detection trucks. Likewise, L-3 could not reasonably have feared suit against non-existent products. As such, this Court never had jurisdiction to declare those backscatter claims invalid.

*AS&E's Motion to Dismiss for Lack of Actual Controversy* [D.N. 7] at 7 (underline in original).

      b.    "While L-3 has not, since June of 2002, sold any truck-mounted mobile X-ray inspection systems that employ backscatter technology, such as would be required by the '511 and '683 patents (that were asserted in the 1998 case), it has been selling transmission-only systems all along." *Declaration of Mark Syrnick in Support of Plaintiff's Opposition to Defendant AS&E's Motion to Dismiss for Lack of Actual Controversy*, dated March 24, 2004, [D.N. 9] at ¶ 37.

As seen below, AS&E has now signed a covenant not to sue L-3 for infringement of the AS&E Patents (*i.e.*, the '533 and '623 patents) by L-3's truck-mounted, transmission-only mobile x-ray inspection systems: namely, the CX-450M, CX-2500M, and CX-3800M products.

    **B.**    **AS&E's Attempts to Quiet the Dispute and L-3's Efforts to Inflame It**

Before this case, AS&E was involved in patent infringement litigation against L-3's predecessor, PerkinElmer/EG&G, here in Boston. That "*EG&G* litigation" (Civil Action No. 98-11939-GAO) concerned two other AS&E patents: U.S. Pat. Nos. 5,313,511 and 5,764,683. Those patents were directed to x-ray systems employing backscatter technology, which is not at issue in this case. The background of that case and its settlement are recounted in AS&E's first motion to dismiss [D.N. 4] and supporting papers [D.N. 5, 12]. A short recap of that background, however, provides necessary context for AS&E's current motion to dismiss. For brevity, however, AS&E will leave out the cites to supporting testimony and exhibits included with the original motion papers filed in March 2004. The recap follows below.

In May 2003, EG&G's then parent, PerkinElmer, and AS&E settled all claims in that *EG&G* litigation to the extent that they arose from EG&G's conduct before June 2002, when

PerkinElmer sold its x-ray inspection business to L-3. That settlement released PerkinElmer/EG&G from all liability under the two patents-in-suit in that case. Significantly, that agreement also released any liability under the '533 patent, which is now one of the two patents at issue in the current litigation. The parties also made L-3 a third-party beneficiary of the settlement agreement. As such, AS&E also released L-3 from any liability under AS&E's patents--including the '533 patent--through June 2002, when L-3 Communications acquired the EG&G x-ray inspection business from PerkinElmer.

Nonetheless, the *EG&G* litigation continued, with the successor entity, L-3, now substituting in for PerkinElmer/EG&G as the defendant. But at that time, in about the summer of 2003, AS&E determined that the new entity, L-3, was not continuing the infringing conduct of its predecessor or, in any event, was not a significant threat to AS&E's "MobileSearch" mobile x-ray inspection product line. Accordingly, believing there was no sound business reason to continue the litigation against L-3, AS&E initiated settlement discussions in an attempt to end the matter. AS&E made a point of asking L-3 to "call off the dogs" (*i.e.*, stay discovery and other litigation activity) to give the parties a chance to negotiate a resolution. But L-3 refused, thus showing its unreasonableness. Perhaps it was being vindictive as a way to punish AS&E for filing the earlier *EG&G* litigation (at the time, many of L-3's executives were hold-overs from the PerkinElmer/EG&G predecessor business). In any event, L-3 wanted more than just a dismissal of the *EG&G* litigation. It wanted rights to all of AS&E's "MobileSearch" patents (*i.e.*, the family of patents directed to mobile x-ray inspection systems).

When those settlement efforts failed, AS&E did the only thing that it could, which was to seek dismissal of the *EG&G* litigation. AS&E considered that litigation to be moot in light of its settlement with PerkinElmer. In an order endorsed on February 19, 2004, this Court (per Judge

O'Toole) dismissed AS&E's claims with prejudice and PerkinElmer/EG&G's counterclaims without prejudice. That order came after (i) two hearings (on February 4th and 11th) in which AS&E's counsel stipulated <u>on the record</u> that it would not sue L-3 for any infringement through the date of the stipulation and (ii) AS&E signed and filed in this Court a covenant not to sue. *See* Exhibit C, Stipulated Order of Dismissal and Covenants.

On the exact same day, February 19, 2004, L-3 filed the above-captioned litigation against AS&E seeking declaratory judgments that the '533 and '623 patents are not infringed, are invalid, and/or are unenforceable. L-3 did so even though AS&E had just won a dismissal of the previous *EG&G* litigation and had made clear that it was not interested in suing L-3.

Apparently, L-3 refused to take AS&E's word that it was not interested is continuing the fight. L-3 did not even wait until the ink dried on the dismissal order before filing this case. Had L-3 let the proverbial sleeping dogs lie, this case never would have happened because, as stated above, AS&E was not interested in pursuing L-3 on the other MobileSearch patents.

But AS&E was serious about wanting peace and proved it by seeking dismissal, hoping to avoid the expense of litigation. L-3 unreasonably resisted that motion.

During this litigation, AS&E took further steps to quiet or end it. For example, in December 2004, AS&E filed an early motion for partial summary judgment [D.N. 31], before substantial discovery got under way, in hopes of short-circuiting the case and thus saving both parties the expense and trouble of costly discovery.

Then, in the spring of 2005, L-3 demanded that AS&E, in the course of prosecuting a "reissue" patent application, bring to the attention of the United States Patent & Trademark Office ("PTO") the on-sale bar and inequitable conduct issues presented in the parties then-pending cross-motions for summary judgment. AS&E did so, at great expense and effort.

6

In demanding this course of action, L-3 made clear that the PTO's examination of that pending reissue patent would somehow be relevant to the on-sale bar and inequitable conduct claims at stake in the pending summary judgment motions. Taking L-3 at its word, AS&E moved to stay this litigation pending the PTO's consideration of the on-sale bar and inequitable conduct issues vis-à-vis the pending reissue patent. In its motion to stay the litigation [D.N. 72], AS&E argued that, if the PTO's consideration of the on-sale bar and inequitable conduct matters were relevant to the pending motions for summary judgment, as L-3 had claimed, it would make sense to wait to decide those motions until the PTO spoke on the matter. AS&E further argued that ceasing litigation activity pending the PTO's consideration would save the parties costly discovery and other litigation activity. Again, L-3 resisted AS&E's reasonable suggestion. As such, L-3 has forced AS&E to defend itself in this litigation, at considerable cost to AS&E in both time and money.

### C. AS&E's Covenant Not to Sue and L-3's Unreasonable Resistance to It

At the beginning of this case, L-3 presented AS&E with the Hobson's choice of (a) signing a *Super Sack* statement (*i.e.*, covenant not to sue) as to the '533 and '623 patents or (b) defending its patents in expensive litigation that it never threatened. At that time, AS&E did not think it necessary to sign a *Super Sack* statement because AS&E had not threatened imminent litigation and, in any event, did not want to be bullied into giving away rights to the '533 and '623 patents so easily or so cheaply, as was its prerogative. AS&E, however, invited L-3 to participate in reasonable, arms-length licensing negotiations, although L-3 refused the invitation.

Although AS&E did everything it could to quiet or end this litigation on reasonable grounds, L-3 has resisted at every step. AS&E suspects, therefore, that L-3's goal is really to force AS&E to spend money on litigation. L-3's most recent actions confirm AS&E's suspicion.

7

AS&E now realizes that an inexpensive and rational end to this case is no longer possible. L-3 will simply not be reasonable. Accordingly, AS&E has no choice now but to sign a *Super Sack* statement to avoid further litigation expenses, such as costly expert discovery and other pre-trial activity ahead. Thus, on November 15, 2005, AS&E's General Counsel, William F. Grieco, sent L-3's General Counsel, Mark Syrnick, a settlement letter offering to sign a covenant not to sue L-3 for infringement of the AS&E Patents by L-3's truck-mounted, transmission-only mobile x-ray inspection systems. Even though L-3 had once demanded that very result, it refused the offer, further demonstrating that L-3's real goal in this case is vindictive--*i.e.*, to force its competitor, AS&E, to spend money on unnecessary litigation.

The offer to sign a *Super Sack* statement should have been more than acceptable to L-3. As seen above, L-3 admits that it only makes and sells transmission-only mobile x-ray inspection systems. L-3 does not produce a truck-mounted mobile x-ray system employing backscatter technology. Accordingly, when L-3 resisted AS&E's first motion to dismiss in March 2004, L-3 stressed that a *Super Sack* covenant not to sue as to its transmission-only systems would end this matter:

    a.    "If AS&E were willing to make a Super Sack Statement on the patents-in-suit that mirrors the one it made to resolve the 1998 Case, then no dispute would remain as to these patents either." *Plaintiff's Opposition to Defendant AS&E's Motion to Dismiss for Lack of Actual Controversy* [D.N. 7] at 21.

    b.    "If AS&E truly has no intention to bring suit against those products ["truck-mounted transmission-only X-ray inspection systems"], it can provide the necessary assurances, and moot this case, by making a legally-binding

8

covenant to that effect . . . ." *Declaration of Mark Syrnick in Support of Plaintiff's Opposition to Defendant AS&E's Motion to Dismiss for Lack of Actual Controversy*, dated March 24, 2004, [D.N. 9] at ¶ 38.

Given these statements that L-3 made to this Court, it is both surprising and frustrating that L-3 has refused AS&E's offer. L-3 is greedy and wants more--*e.g.*, rights to the pending reissue patent or, perhaps, rights to patents requiring backscatter detection. But AS&E has never threatened suit on other patents. Thus, L-3 cannot reasonably try to include that in the settlement.

Moreover, even though AS&E has earnestly been trying to settle this case and has offered what L-3 demands, L-3 has continued to press this matter and thus force AS&E to spend even more litigation dollars. Specifically, the day after Mr. Grieco faxed his offer to Mr. Syrnick, L-3 filed a new motion for summary judgment [D.N. 93] on November 16, 2005. Before L-3 filed, however, AS&E's litigation counsel, Mr. Belt, called L-3's litigation counsel, Mr. Abrahamsen, to request that L-3 wait to file the motion pending further settlement discussions between the in-house counsel. Mr. Abrahamsen was not available, so Mr. Belt left him a voice mail message asking him to call back <u>before</u> filing the motion. Mr. Abrahamsen never returned Mr. Belt's call, however, and filed the motion an hour or two later. That conduct shows that L-3 wants nothing to do with a reasonable end to this fight and wants instead to prolong the misery.

Attached as Exhibit A is the document L-3 said would moot its claims: AS&E's duly signed *Super Sack* covenant not to sue. Specifically, AS&E covenants as follows:

> AS&E agrees not to make any claim against L-3 alleging infringement of the two patents-in-suit, namely, U.S. Patent No. 5,903,623 and U.S. Patent No. 6,292,533(the "AS&E Patents"), arising out of any past, present, or future manufacture, use, sale, offer for sale, or importation of any accused product previously or currently manufactured, used, sold, offered for sale, or imported by L-3, as of the date of this covenant, as limited to the accused products specifically listed below. The following L-3 truck-mounted, transmission-only mobile x-ray inspection systems are within the scope of the covenant:

9

   \*  CX-450M
   \*  CX-2500M
   \*  CX-3800M

*See* Exhibit A. This covenant should end all claims in this litigation, as argued below.[2]

## ARGUMENT

**I. THIS COURT MUST DISMISS ALL CLAIMS AND COUNTERCLAIMS**

 Under Fed. R. Civ. P. 41(a)(2), AS&E moves to dismiss its counterclaims in this case. Indeed, AS&E now covenants not to sue L-3 for infringement. That covenant removes any actual controversy and thus, as a matter of law, immediately deprives this Court of jurisdiction to hear L-3's declaratory judgment claims. Accordingly, this Court must dismiss L-3's claims as well.

 "'[T]he basic purpose of Rule 41(a)(2) is to freely permit the plaintiff, with court approval, to voluntarily dismiss an action so long as no other party will be prejudiced.'" *Less v. Berkshire Housing Servs., Inc.*, 2000 WL 1349252, at \*2 (D. Mass. Aug. 18, 2000) (quoting *Puerto Rico Maritime Shipping Auth. v. Leith*, 668 F.2d 46, 50 (1st Cir. 1981)). Here, L-3 cannot possibly be prejudiced by the dismissal of AS&E's infringement claims. Indeed, as seen above, AS&E's covenant was what L-3 sought in the first place.

 Moreover, a declaratory judgment action requires an "actual controversy." 28 U.S.C. § 2201. Absent an actual controversy, a district court lacks subject matter jurisdiction to declare the rights of the parties and must therefore dismiss the case. *Teva Pharm. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1335 (Fed. Cir. 2005).

---

  [2] AS&E copied this covenant, nearly *verbatim*, from the one that L-3 accepted for ending the *EG&G* litigation. Thus, this from of covenant should be acceptable to L-3 now.

With AS&E's covenant, L-3's declaratory judgment claims are now moot. There is no longer any live controversy between the parties. Thus, there is no reason for maintaining the declaratory judgment claims. Indeed, this Court no longer has jurisdiction to decide the declaratory judgment claims. *See Super Sack Mfg. Corp. v. Chase Pkg. Corp.*, 57 F.3d 1054, 1060 (Fed. Cir. 1995) ("Super Sack's promise not to sue renders any past or present acts of infringement that Chase may or may not have committed irrelevant to the question whether a justiciable controversy remains. . . . The only proper course for the trial court was to dismiss the case for lack of jurisdiction…."); *see also, e.g., Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999) (patent owner's covenant not to sue removed any live controversy and thus divested the court of declaratory judgment jurisdiction); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 637 (Fed. Cir. 1991) (patentee released defendant and stated that defendant was not liable for infringement. Given these assurances, there was no continuing case or controversy on which to base a declaratory judgment action.).[3]

Therefore, while the voluntary dismissal of a party's claims ordinarily leaves any counterclaims pending for adjudication, *see* Fed. R. Civ. P. 41(a)(2), here the entire action should be dismissed. *See Waters Corp. v. Hewlett-Packard Co.*, 999 F. Supp. 167, 173 (D. Mass. 1998) (Gorton, J.) (dismissing declaratory judgment action for invalidity and non-infringement of the patent because the plaintiff was under no threat, and the patentee alleged no infringement); *Grain Processing Corp. v. American Maize-Products Co.*, 840 F.2d 902, 905-06 (Fed. Cir. 1988)

---

[3] L-3's currently pending motion for summary judgment should not factor into the Court's consideration of AS&E's motion. In *Super Sack*, a motion for summary judgment was briefed but not yet heard when Super Sack promised not to sue. *See* 57 F.3d at 1056. That promise immediately divested the court of jurisdiction. Moreover, L-3 filed its summary judgment motion <u>after</u> AS&E offered the covenant and, indeed, <u>after</u> AS&E's counsel, Mr. Belt, called and left L-3's counsel a message to hold off filing for summary judgment.

(affirming dismissal of declaratory judgment counterclaims when the patentee dropped infringement claims during the litigation).

## II. THIS COURT SHOULD STAY FURTHER LITIGATION ACTIVITY PENDING DISMISSAL

Given that AS&E now covenants not to sue, thus rendering any further litigation moot (and, indeed, divesting this Court of jurisdiction to entertain L-3's declaratory judgment claims), this Court should stay any further litigation activity until this Court can act on AS&E's motion.

In particular, there is no need now to consider L-3's motion for summary judgment. AS&E thus requests that its response to that motion be continued pending resolution of this motion to dismiss. AS&E's covenant not to sue moots the controversy, making a response to summary judgment wasteful and unnecessary.

Moreover, a number of litigation deadlines are approaching, particularly for expert reports and expert discovery. Thus, AS&E has given in to L-3's demands for a *Super Sack* statement to save both parties the extraordinary expense of expert discovery. Indeed, to save L-3 further expenses, AS&E, in the course of the Rule 7.1 conference, told L-3 that it does not expect L-3 to serve expert reports pending resolution of AS&E's motion.

## III. THIS COURT SHOULD SANCTION L-3 FOR NEEDLESSLY INCREASING THIS LITIGATION

As seen above, AS&E has done everything it could to end or decrease this litigation. L-3, however, has resisted all attempts to be rational. It may be that L-3 is continuing to press this litigation only to gain advantage in on-going settlement discussions with AS&E. Or it may be that L-3 is vindictive and wants to punish its head-to-head competitor, AS&E, for having filed the earlier *EG&G* litigation. Whatever its motivation, however, L-3's conduct is vexatious and has resulted in increased and unnecessary litigation costs.

This Court has inherent power to sanction L-3 and to award AS&E its attorneys' fees and costs as a result of L-3's vexatious litigation. *See L.E.A. Dynatech, Inc. v. Allina*, 49 F. 3d 1527, 1530 (Fed. Cir. 1995). In that case, the district court properly awarded attorneys' fees when the defendant sought to stay litigation pending the PTO's consideration of a reissue application. The plaintiff opposed the stay. As a result, the parties incurred expenses in discovery and pre-trial activity. Later, the plaintiff reversed course and moved for a stay. Accordingly, the district court reasonably found that the plaintiff "used the litigation to impose expenses on a competitor and to gain an advantage in the marketplace." *Id.* at 1531.

*L.E.A. Dynatech* is similar to the situation in this case. Here, AS&E sought a stay pending the PTO's review of a pending reissue application, and L-3 opposed. Thus, AS&E was forced to participate in costly discovery, including numerous depositions that L-3 noticed. Moreover, like the plaintiff in *L.E.A. Dynatech*, L-3 has reversed positions. At first, L-3 said that it would accept a *Super Sack* statement. Now it refuses. L-3's bait and switch tactics can only be seen as an attempt to force its competitor, AS&E, to spend money on litigation rather than on competition in the marketplace. An award of attorneys' fees is called for in the wake of such abuse. *Id.*

Moreover, courts have disapproved of the same kind of tactics that L-3 now uses to gain advantage in licensing negotiations. *See, e.g., Waters Corp. v. Hewlett-Packard Co.*, 999 F. Supp. 167, 173-174 (D. Mass. 1998) (Gorton, J.) (court "would dismiss this action rather than reward [declaratory judgment plaintiff's] use of a judicial remedy to obtain a more favorable bargaining position in its negotiations with [the patentee]"); *EMC Corp. v. Norland Corp.,* 89 F.3d 807, 810-15 (Fed. Cir. 1996) (reasoning that allowing a declaratory judgment action to proceed "would encourage parties who were negotiating with patentees to use the declaratory

judgment procedure to improve their bargaining positions" and would force patent owners to give more favorable licenses to avoid litigation costs. Such tactics are inconsistent with the purpose of the Declaratory Judgment Act).

Accordingly, this Court should sanction L-3 for its abuse of this litigation. Upon the Court's approval, AS&E will furnish a bill of costs and fees incurred to date.

## CONCLUSION

For the reasons stated above, AS&E respectfully requests that this Court (a) dismiss all claims and counterclaims in this action, (b) stay further litigation activity pending action on this motion, and (c) sanction L-3 by awarding AS&E its attorneys' fees and costs in this litigation.

| | |
|---|---|
| Dated: November 30, 2005 | AMERICAN SCIENCE AND ENGINEERING, INC. |
| | *By its attorneys*, |
| | /s/ Erik P. Belt |
| | Erik Paul Belt, BBO # 558620 |
| | John F. Ward, BBO# 646689 |
| | BROMBERG & SUNSTEIN LLP |
| | 125 Summer Street |
| | Boston, Massachusetts 02110 |
| | Tel: (617) 443-9292 |
| | Facsimile: (617) 443-0004 |
| | ebelt@bromsun.com |

01945/00511 448238.1